1
2
3
4
5
6
7
8

9 **UNITED STATES DISTRICT COURT**

10 EASTERN DISTRICT OF CALIFORNIA

11

12 DONALD ALAN SCHNEIDER,                     Case No.  1:14-cv-00034-SKO

13                          Plaintiff,         **ORDER ON PLAINTIFF'S COMPLAINT**

14         v.                                  (Doc. Nos. 1, 15)

15 CAROLYN W. COLVIN,
16 Acting Commissioner of Social Security,

17                          Defendant.

18     _____

19

20                          **INTRODUCTION**

21         Plaintiff Donald Alan Schneider ("Plaintiff") seeks judicial review of a final decision of the

22 Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for

23 Disability Insurance Benefits ("DIB") benefits pursuant to Title II of the Social Security Act.

24 42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were

25 submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

26 Judge.[1]

27     _____

28 [1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 8, 10.)

1
2
3
4
5
6
7
8
9

**FACTUAL BACKGROUND**

Plaintiff filed an application for DIB on August 31, 2007, alleging disability beginning on August 31, 2007, due to Dysthymic Disorder, Posttraumatic Stress Disorder ("PTSD"), Personality Disorder, substance abuse, in remission, a pain disorder, left shoulder cuff impingement, and chronic neck and shoulder pain.  Plaintiff has a 12th grade education and served on activity duty in the United States Marines from 1978 until 1984 when he was honorably discharged.  (AR 574, 1182.)  Plaintiff worked as a mail clerk for the Internal Revenue Service ("IRS") from 1991 to 2007, when he resigned due to what Plaintiff described as a hostile work environment and a director Plaintiff did not like.  (AR 156, 587.)

10

**A.      Relevant Medical Background**

11
12
13
14

Clinical psychiatrist A. A. Howsepian, M.D., Ph.D., began treating Plaintiff at the Veterans Administration Central California Health, Mental Health Clinic ("VA") in 2003.  (AR 579, 812.)  Plaintiff saw multiple medical professionals at the VA facility, the reports of whom are contained in his health summary records from the VA.

15
16
17
18
19
20

On August 29, 2007, Thomas J. O'Rourke, an addiction therapist at VA, noted Plaintiff was easily stressed, slow at tasks, and did not sleep well.  (AR 245.)  O'Rourke indicated Plaintiff was depressed, angry, irritable, explosive, dysphoric, anxious, and feeling hopeless.  (AR 245.)  Plaintiff indicated he and his wife were about to lose their home, and his wife was angry with him.  (AR245.)  Although O'Rourke and Plaintiff discussed multiple possible options for employment, O'Rourke noted Plaintiff was not suitable for any of them.  (AR 245.)

21
22

On September 11, 2007, Dr. Howsepian drafted a letter to the Civil Service Retirement System ("CSRS") regarding Plaintiff's condition.  (AR 244.)

23
24
25
26
27

[Plaintiff] has been under my outpatient psychiatric care at the [VA] since 7 July 2003.  He is being treated with both psychotherapy and pharmacotherapy for depression and anxiety whose primary source has been employment (Internal Revenue Service) related stressors.  His current primary diagnoses are Dysthmyic Disorder (with significant adjustment overlay), Anxiety Disorder NOS, Learning Disorder NOS, Pain Disorder, and Obstructive Sleep Apnea.  He also has a history of Cannabis and Alcohol Dependence that have been in Full Sustained Remission.  His current psychiatric medications include mirtazapine 7.5 mgs at bedtime,

28

hydroxyzine 25 mgs at bedtime, venlafaxine SA 375 mgs every morning, buspirone 20 mgs tid, and modafinil 400 mgs every morning.

[Plaintiff's] psychiatric condition has worsened appreciably over the past 4 years, in spite of intensified efforts to treat him.  He has attempted, on multiple occasions, unsuccessfully, to return to work.  He is exquisitely sensitive to stress, exhibiting both somatic symptoms (tachycardia and hypertension) and myriad psychiatric symptoms in the face of occupational stressors (perceived repeated har[]assment resulting in a hostile work environment).   [Plaintiff's] symptoms include the following:   depression, anxiety, dysphoria, hopelessness, helplessness, anger, irritability, explosivity (with episodes of violent behavioral dyscontrol), psychomotor retardation, frustration, tearfulness, pessimism, fatigue, sleep disturbance, multiple pain complaints, numbness of left hand, and marital discord.  On multiple occasions he has lost control of himself and has violently broken multiple items in his home.

The protracted exacerbation of [Plaintiff's] anxiety and depressive disorders are, in my professional opinion, clearly causally linked to stresses at the IRS caused by repeated instances of harassment resulting in a perceived hostile work environment . . . .

(AR 244.)

In January 2008, Plaintiff was seen by Steven C. Swanson, Ph.D., for a consultative psychiatric examination.  (AR 387-93.)  Dr. Swanson opined Plaintiff was

able to maintain concentration or relate appropriate to others in a work setting.  He would be able to handle funds in his own best interests.  He is expected to understand, carry out, and remember simple instructions.  He is judged as able to respond appropriately to usual work situations, such as attendance, safety, and the like.  Changes in routine would not be very problematic for him.  There do not appear to be substantial restrictions in daily activities.

(AR 393.)  J. Levinson, Ph.D., also reviewed Plaintiff's records in January 2008 and determined that Plaintiff's mental conditions caused him only mild limitation in the area of social functioning and in maintaining concentration, persistence, or pace.  (AR 405.)  He opined Plaintiff's mental status appeared to have normalized after he resigned from his position at the IRS.  (AR 407.)  Although Plaintiff continued to have some financial stressors, Dr. Levinson opined that Plaintiff did not have any evident functional limitations and his mental condition was "non-severe." (AR 407.)

On February 11, 2008, Dr. Howsepian noted Plaintiff had resumed "going to Temple," and wanted to rebuild his relationship with God.  (AR 801.)  Plaintiff was angry that no one from the

3

Temple had called him to "see how he was doing."  (AR 801.)  He noted he was appealing his social security claim, and he talked with Dr. Howsepian about "possible PTSD," trauma of bombing in Lebanon, that his wife had lost her job, and that he had interviews that day and the next.  (AR 801.)  Plaintiff complained that he had no friends and he was not able to make them; he "entertained the idea that, perhaps, he himself is a barrier to this."  (AR 801.)  He had had surgery, he was no longer using a continuous positive airway pressure ("CPAP") machine, was sleeping well, and his facial appearance was "different."  (AR 801.)  Overall, Dr. Howsepian reported Plaintiff to be "resigned, somewhat depressed[,] less angry, irritable, and anxious."  (AR 801.)

On April 10, 2008, Plaintiff started mood disorder group therapy, which was led by Jack H. Papzian, Ph.D.  (AR 779.)  On April 29, 2008, Plaintiff was noted by Dr. Howsepian to be "distraught, frustrated, tired. No SI."  (AR 769.)  On June 9, 2008, Dr. Howsepian noted Plaintiff's mother had died, and he had arrived at her hospital too late to see her before she passed away which was very upsetting to Plaintiff.  (AR 749.)  Dr. Howsepian reiterated his "firm professional opinion" that Plaintiff could not return to work at the IRS.  (AR 749.)  Plaintiff noted an opening at VA in refrigeration maintenance, but he had no experience or skill in this area.  (AR 749.)  Plaintiff reported he had no income coming in, and he was at risk of losing his home.  (AR 749.)  Dr. Howsepian noted Plaintiff was tearful when talking about his mother's death, and he was frustrated and angry about his work and financial situation.  (AR 749.)  Dr. Howsepian noted a dysphoric restricted affect, and that Plaintiff appeared to have lost some weight.  (AR 749.)  He diagnosed Plaintiff with dysthymic disorder, PTSD, adjustment disorder with anxiety and depression, and a pain disorder.  (AR 749.)

On June 10, 2008, Dr. Howsepian drafted another letter to the Disability, Reconsideration and Appeals Group of the United States Office of Personnel Management ("OPM") in response an April 2008 letter from OPM indicating Plaintiff was not disabled within the meaning of retirement law.  (AR 745.)  Dr. Howsepian's letter, in relevant part, explained that

> [Plaintiff's] symptoms of depression, anxiety, irritability, dysphoria, explosivity (including behavior dyscontrol resulting in his overturning furniture and breaking things), his shutting down emotionally, his exquisite sensitivity to stress, his

substantial elevation in his blood pressure (up to 180/100) as a result of stress and anxiety, and his having days when he scarcely gets out of bed certainly qualifies as a disabling, serious psychiatric disturbance with significant deterioration from a prior level of functioning that can clearly causally be traced to stressors at the IRS . . . I have written MULTIPLE letters to the IRS stating that, due to profound psychiatric reactions to stress in that context, Mr. Schneider is wholly and completely  disabled from employment at that institution and, therefore, that he should be provided medical leave (which he has been provided, with multiple extensions) . . . .

(AR 746.)

On July 29, 2008, Plaintiff again saw Dr. Howsepian who noted that Plaintiff was "profoundly dysphoric, tearful, on the verge of decompensating." (AR 727.) Dr. Howsepian reported that there was no "movement in any direction in his situation, except that he is now wholly out of money and on the verge of losing his home." Plaintiff reported his wife was out of work due to sciatica. Dr. Howsepian found Plaintiff to be "profoundly frustrated and hopeless, angry to the point of being rageful," and at significant risk for further decompensation. (AR 727.)

On August 19, 2008, Plaintiff again saw Dr. Howsepian who noted that Plaintiff remained dysphoric, pessimistic, and saw no way out. (AR 722.) Plaintiff reported that he would lose his house, and his wife's situation had not improved. (AR 722.) Dr. Howsepian reported Plaintiff appeared angry, dysphoric, and pessimistic; Plaintiff denied any suicidal or homicidal ideation; and, although, there was no disorganization in thought, there were long periods of silence. (AR 722.) Plaintiff was noted to be upset, tearful, and felt no one cared about him. (AR 722.)

On September 29, 2008, Plaintiff was noted by Dr. Howsepian to be dysphoric, upset about his situation, and became especially angry when any discussion of his returning to work was broached, "claiming that he would be fired after he call[ed] in sick, [and he was] unable to work." (AR 714.) Plaintiff continued to hold out hope for disability, but the relationship with his wife remained strained. (AR 714.) Plaintiff reported he had missed his mortgage payment that month and believed he would lose his home. (AR 714.) Dr. Howsepian reported Plaintiff was "[d]ysphoric, angry, upset, depressed, hopeless, helpless. Repeatedly states that no one is helping him, veterans, that he has no options, that he is f***ed no matter what he does." (AR 714.)

On October 27, 2008, Plaintiff attended his group therapy session and appeared sad and resigned about his pending and apparent separation and divorce from his spouse. (AR 706.)

Plaintiff was staying with a friend, and he interacted with his peers after the group.  Plaintiff reported that he was in a deep depression about losing his home, and his attorney had informed him the statute of limitations had expired on his discrimination claim against the IRS.  (AR 706.) Plaintiff was able to tolerate feedback from his peers "and responded in kind."  (AR 706.) Plaintiff was reasonable and responsive with the group as well as appropriate and cooperative with the staff.  (AR 707.)

On December 15, 2008, Plaintiff was again seen by Dr. Howsepian who noted that Plaintiff was relatively stable despite multiple stressors.  (AR 684.)  Plaintiff was in the process of divorcing his wife, his wife was taking the dogs that he loves, and Plaintiff was living with a gentleman in a senior living community and if anyone found out Plaintiff would be displaced. (AR 684.)   Dr. Howsepian noted Plaintiff had no disorganization, and was "[l]ess angry, depressed, and on edge than I have seen him in quite a while."  (AR 684.)

On January 21, 2009, Plaintiff reported living with a friend who was not charging him any rent, and in return Plaintiff was helping his friend in various ways.  (AR 677.)  Plaintiff reported going to AA meetings and "CD aftercare" at the VA.  (AR 677.)  Plaintiff had surgery scheduled for his shoulder; he was worried he might be displaced from his friend's house, and repeatedly asked why someone "does not have the courage to put him on disability."  (AR 677.)  Plaintiff expressed that he was willing to do what he needed to do to either "get back to work or show that he cannot."   (AR 677.)   Dr. Howsepian noted Plaintiff presented as angry, frustrated, and depressed.  (AR 677.)  Plaintiff showed no aggression towards his wife, had no disorganization of thought, and maintained fair eye contact.  (AR 677.)

On February 2, 2009, Plaintiff participated in group therapy.  (AR 675.)  The therapy note indicates Plaintiff had to leave his current living situation with his friend, and he was now living with his younger brother who had addiction issues.  (AR 675.)  Plaintiff indicated he was having to sleep "in a roach-infested environ[ment]."  (AR 675.)

On February 6, 2009, an orthopedic outpatient surgery note indicated that in discussing his shoulder surgery, Plaintiff became agitated and accusatory and stated he was forced to have the shoulder surgery because otherwise social security would "cut [him] off" for refusing.  (AR 672.)

His physician, Dr. Kwock, indicated he would perform the surgery, but Plaintiff did not "seem to be receptive, [and his] rather hostile demeanor continued."  (AR 672.)  Plaintiff's conversation with Dr. Kwock appeared to escalate and Plaintiff left the room "stating this is only a waste of his time."  (AR 672.)  It was noted that the consultation would not be rescheduled for the elective surgery, and that Plaintiff "would likely benefit from social work consult for housing/financial assistance during this time."  (AR 672.)

Plaintiff was seen by therapist O'Rourke on February 23, 2009, who noted Plaintiff was angry about not having a bed in the VA homeless program and stated he was "going to have to go do something to get some help around here."  (AR 656.)  Upon exiting, Plaintiff slammed the door, walked away, and would not respond to several phone calls from O'Rourke.  (AR 656.)  When O'Rourke reached Plaintiff over the telephone, Plaintiff stated that he was going to drink some alcohol and that this "possibly would help him to get a bed in some way.  He used obscenities and stated that staff did not care."  (AR 656.)  He was counseled to come to group therapy and discuss his concerns, but Plaintiff "expressed zero interest in this plan," and he hung up on O'Rourke.  (AR 656.)

On February 24, 2009, Plaintiff visited the Healthcare for Homeless Veterans Program ("HCHV") office seeking placement in a program bed.  (AR 654.)  The social worker noted he was angry he had not been placed in a bed upon his demand.  (AR 654.)  Plaintiff implied that if was not placed in a program bed he might hurt himself or "go out and drink," but he specifically denied any suicidal or homicidal intentions when asked directly.  (AR 654.)  Plaintiff was described by the social worker as non-compliant with appointments, manipulative, and verbally aggressive when his demands were not satisfied.  (AR 655.)  Later in the afternoon, Plaintiff returned to the HCHV office on a walk-in basis and presented as "angry and verbally confrontive to the volunteer who was sitting at the desk, because [the] worker did not see him when he arrived."  (AR 655.)  Plaintiff was advised that he would be seen, but he would have to wait; before the worker could "get to him[, Plaintiff] threw his telephone cards and the referral information at the volunteer and stomped out the door, slamming it as he exited."  (AR 655.)

1    On March 3, 2009, Plaintiff left a phone message for O'Rourke apologizing for his
2    behavior on February 23.  (AR 652.)  Plaintiff stated he had been under stress and had gone to be
3    with his sister for a week.  (AR 652.)  He had returned to Fresno and had obtained housing with
4    someone he did not care to discuss.  (AR 652.)

5    On March 4, 2009, Plaintiff returned to the HCHV program office to again inquire about
6    possible housing.  (AR 651.)  He was described as much more reasonable during this interview.
7    (AR 651.)  He explained that he had been in counseling for anger in the past and he admitted he
8    did not listen well and was not open to what was being taught.  (AR 651.)  He also reported he had
9    been living in a van that he owns, and his only income was from VA disability.  (AR 651-52.)  He
10   was counseled to return in one week for case management.  (AR 652.)

11   On March 11, 2009, Plaintiff saw Dr. Howsepian again who noted that Plaintiff was now
12   in a VA homeless program, living on the west side of Fresno where he had his own room, but that
13   Plaintiff thought he might be assigned a roommate.  (AR 648.)  Plaintiff was noted to be compliant
14   with his medication, and asked for more pharmacological help with his depression which,
15   "although improved, is not at baseline."  (AR 648.)  Dr. Howsepian noted Plaintiff was dysphoric,
16   angry, frustrated, and depressed but was "clearly significantly improved."  (AR 648.)

17   On April 30, 2009, Plaintiff went to the HCHV office to discuss a dispute he had with his
18   apartment manager.  (AR 632.)  He reported he and the manager argued and the argument
19   escalated until both came to the HCHV office to discuss the issue.  (AR 632.)  The social worker's
20   note states that by the time Plaintiff got to the HCHV office, "he was in control of his temper,
21   recognized he was incorrect and acknowledged his wrong doing."  (AR 632.)

22   On June 15, 2009, Dr. Howsepian reported Plaintiff was living at the VA homeless
23   housing unit and was comfortable there.  (AR 618.)  Plaintiff reported he would like a job with the
24   post office or VA.  (AR 618.)  Plaintiff noted his divorce was now final.  (AR 618.)  Dr.
25   Howsepian indicated Plaintiff was "[c]almer than I have seen him, and at times shows flashes of a
26   brighter mood."  (AR 618.)  Plaintiff was prescribed a trial of clonazepam and was encouraged to
27   continue with vocational rehabilitation.  (AR 618.)

28

On June 20, 2009, Plaintiff reported to Anne W. Walker ("Walker"), a clinical social worker at VA. (AR 563.)  Walker noted Plaintiff was asked about his depression and anxiety, but denied any significant disturbances. (AR 563.)  It was noted that Plaintiff was "slightly paranoid most of the time, but he was not delusional." (AR 563.)  He appeared alert, clean, appropriately dressed, but his insight appeared superficial and his judgment was impaired.

On June 22, 2009, Plaintiff again saw Walker for HCHV case management. (AR 616.) Walker observed that Plaintiff "remained irritable, annoyed, and complaining.  He is still angry, frustrated, had clear speech, and moderate eye contact." (AR 616.)  His mood remained irritable and he was focused on obtaining benefits and did "not see the impact of his presentation and personality." (AR 617.)  Walker considered Plaintiff's judgment flawed and self-centered, and his insight remained limited. (AR 617.)

On July 14, 2009, Plaintiff was seen by Trevor D. Glenn, M.D., for a VA compensation examination. (AR 574-95.)  After a comprehensive review of Plaintiff's records and a mental status examination, Dr. Glenn noted the following:

> There is impairment in his thought processes and communication in terms of concentration, focus, effort.  He does not have delusions or hallucinations.  Eye contact with him is good in the interview and there is no inappropriate behavior. He tears up initially when talking about the bombing in Lebanon and does the same when we get to Oklahoma City and the World Trade center event.  He does not give any history of suicidal or homicidal thoughts, although he gives a history of getting very angry with politicians who did not go in and "finish the job[.]"  He was able to maintain minimal personal hygiene.  He dresses and bathes.  He is in some disarray this morning.  He cooks for the group at the homeless center one out of every eight times.  He is oriented to time, place and person.  He shows some complaint of short-term memory loss, but his short-term memory loss evaluates adequately.  He does not give any history of compulsive checking or ritualistic behavior.  His rate and flow of his speech is at times over-productive and at other times is under-productive.  At times of reflection he gets quite silent and is preoccupied in his thinking at that time.  He does not give a history of panic attacks.  He does give a history of depression and depressed mood.  He also gives a history of impaired impulse control with anger control problems about once a week yelling.  He does not have a sleep impairment associated with nightmares or dreams.  He does have it related to the sleep apnea disorder and/or turning behavior with sore shoulders and so forth that bring forth difficulty sleeping.
>
> . . .

Integrated summary and conclusions show that this is a 50-year-old divorced Caucasian male who shows a moderate impairment and reduced reliability and productivity due to his major depressive disorder, which is moderate at this time. This decrease in psychosocial functioning status and quality of life has been at that level of intensity since 1995 when he first came to the VA for treatment of his psychological condition

. . .

The effects of major depression on his occupational and social functioning show there is reduced reliability and productivity as described previously.

(AR 592-95.)  Dr. Glenn diagnosed Plaintiff with major depression, recurrent and chronic in nature, but "moderate in degree."  (AR 594.)  Dr. Glenn assigned a Global Assessment of Functioning ("GAF") score of 55 which he reported was indicative of "moderate impairment." (AR 594.)[2]

On July 31, 2009, Plaintiff again saw Walker in conjunction with his housing.  She described Plaintiff as exhibiting a degree of paranoia and a "significant attitude of entitlement." (AR 857.)  Walker considered his insight to be minimal with limited judgment.  (AR 867.) Walker considered him argumentative and easily offended.  (AR 867.)

On September 22, 2009, Plaintiff appeared at the HCHV office.  (AR 834.)  Walker noted Plaintiff had been edgy and irritable due to several problems including divorce, illness, lack of housing, and problems with his social security application.  He and his roommate had a quarrel the prior week and before returning from a weekend pass, Plaintiff called his housing manager to warn him that he would not tolerate problems with his house roommate.  (AR 834.)  The housing manager stated he perceived the statement as a threat to Plaintiff's roommate and moved the roommate to another bedroom.  (AR 834.)  Plaintiff was advised to go to the HCHV office to discuss his statements to the housing manager.  (AR 834.)  When he arrived at the HCHV office,

---

[2] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness," not including impairments in functioning due to physical or environmental limitations. *Id.* at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

Walker reported Plaintiff sat with his arms crossed during their meeting, held a ridged posture, maintained very poor eye contact, tolerated no discussion about issues, and was not open to any feedback.  (AR 834.)  Because of Plaintiff's presentation, Walker initiated a call to Dr. Howsepian to assess Plaintiff for stability and medication issues.  (AR 835.)  While Walker noted Plaintiff was not delusional during his time at her office, he was "emotionally unreachable, angry, resentful, withdrawn, [and] non participatory in conversation." (AR 835.)

On September 22, 2009, Plaintiff followed-up with Dr. Howsepian who noted that he had received a communication from Walker.  (AR 833.)  She indicated to Dr. Howsepian that Plaintiff had access to a gun and that he had made reference to the fact that he might harm his roommate. (AR 833.)  Walker described Plaintiff as angry and not coping well.  (AR 833.)  Plaintiff was given an extension of his housing at the homeless program because of his "precarious emotional condition."  (AR 833.)  Dr. Howsepian noted Plaintiff was quiet, depressed, irritable, and angry. (AR 833.)

In October 2009, Dr. Howsepian completed a source statement regarding Plaintiff's mental health condition and limitations.  (AR 812-15.)  He opined Plaintiff had no ability to relate to co-workers, the public, supervisors, or any ability to deal with work stress.  (AR 813.)  Dr. Howsepian opined that Plaintiff's

> intense anger, cognitive distortions, explosivity & emotional instability result in his reacting to perceived injustices & slights in a manner that is incompatible with gainful employment.  The degree & extent of his interpersonal conflicts are incompatible with the adequate functioning of the systems in which he is placed. His anger & irritability impair his judgment & disturb his attention. He is exquisitely vulnerable to stress.  Finally, when substantially stressed & confronted by those in authority, he is prone to become violent.

(AR 813.)  Dr. Howsepian went on to explain that, "[e]ven if given a task that isolates him from others, [Plaintiff's] perception of work rules, the system in which he is placed, [and] the work arrangements of others that might differ from his are subject to intense scrutiny [and] if/when problems are found, he is liable to react strongly."  (AR 814.)

On November 2, 2009, Plaintiff saw Dr. Howsepian who noted that Plaintiff was "dramatically improved."  (AR 1747.)  Dr. Howsepian reported this was likely due to multiple

factors including his prescription for Abilify, upcoming resolution of his social security issues and where he will be living, and that he was receiving additional money for recruiting veterans to live in his section 8 apartment complex.  (AR 1747.)

On November 3, 2009, Plaintiff met with licensed clinical social worker Nikki Garner to establish case management in the HUD-VAS program.  (AR 1746.)  Plaintiff received a voucher toward housing, and it was noted he had moved into an apartment on October 7, 2009. (AR 1746.)  Plaintiff was reported as having a normal tone of voice, congruent thought processes, and he denied feelings of tension and anxiety.  (AR 1746.)  Plaintiff was optimistic about his future and had appropriate long term life goals.  (AR 1746.)

On December 18, 2009, Plaintiff again saw his social worker regarding his participation in the HUD-VAS program.  (AR 1741.)  Plaintiff reported he had no issues with his current apartment, he was socializing with other veterans in his community, and he had no feelings of depression.  (AR 1741-42.)  On January 19, 2010, a social worker from the HUD-VAS program entered a note that Plaintiff had no issues with his housing, and he was socializing with other veterans. (AR 1738.)

On February 8, 2010, Plaintiff saw Dr. Howsepian who reported Plaintiff had been denied social security disability, but Plaintiff planned to appeal.  He was pooling resources for food with a friend who lives in his complex, and Plaintiff stated it was good to have a friend.  (AR 1733.) Dr. Howsepian noted Plaintiff remained depressed, but smiled more than he had yet seen.  He was neat and clean in appearance.  (AR 1733.)

On April 19, 2010, Plaintiff reported to Dr. Howsepian that he was frustrated by the social security judge who decided his case.  (AR 1721.)  Apparently the judge had determined that Plaintiff had smoked marijuana despite that Plaintiff had a long history of abstinence.  (AR 1721.) Dr. Howsepian noted Plaintiff was subdued, a-motivated, but he maintained good eye contact. (AR 1721.)

In June 2010, Plaintiff received a prescription for medical marijuana, which he reported helped him with his pain.  (AR 1310, 1679, 1699.)  On June 28, 2010, Plaintiff reported having shoulder surgery and was experiencing pain as a result.  (AR 1679.)

In September 2010, Plaintiff's social worker at the HUD-VAS housing program noted Plaintiff forgot that he had a scheduled visit with a social worker. (AR 1652.) The social worker reported that other HUD-VAS housing veterans expressed concern about Plaintiff's mental health, depression, substance use, and possible suicidal ideations. (AR 1652.) Plaintiff denied any substance abuse and stated he was taking his pain medication. (AR 1652.) Plaintiff appeared to be functioning well in his apartment and was able to meet his personal needs at that time. (AR 1652.) Plaintiff was noted to be fairly guarded about his mental health issues, but that he had support of other veterans in his complex. (AR 1653.) At a November 2010 medical appointment, Plaintiff's primary care physician at VA noted that Plaintiff was smoking but trying to quit, smoked marijuana for pain, and drank socially. (AR 1629.)

In December 2010, a social worker from the HUD-VAS housing program contacted Plaintiff and asked him to come to the housing office to discuss his case management. (AR 1607.) The social worker was noted to have made the request because of Plaintiff's aggressive actions toward another veteran at the apartment complex. (AR 1607.) Plaintiff was "extremely angry" at being required to come to the housing office because the social worker was not going to Plaintiff's home as originally planned. (AR 1607.) Plaintiff came to the housing office and met with a social worker and the apartment manager to discuss the situation that had occurred at the apartment. (AR 1607.) Plaintiff apologized for his behavior toward the social worker, and he was calm at the end of the meeting. (AR 1607.) Plaintiff's behavior was described as intense. (AR 1607.)

In January 2011, a social worker met with Plaintiff at his apartment in relation to his participation in the HUD-VAS housing program. (AR 1597.) Plaintiff stated that he enjoyed helping others, and often loaned his vehicle to friends when they had emergencies. (AR 1597.) Plaintiff stated he was depressed during the Christmas holiday, and he struggled with depression. (AR 1597.) He reported that when he was depressed, he called friends from his counseling group. (AR 1597.) The social worker reported Plaintiff was clean, appropriately dressed, engaged in conversation, and gave good eye contact. (AR 1597.)

In May 2011, Plaintiff saw Dr. Howsepian who reported Plaintiff called and "came in in crisis." (AR 1524.) Images of the Oklahoma City Bombing and the Twin Towers were very

13

disturbing to him emotionally, he had been depressed, irritable, and on edge.  (AR 1524.)  Dr. Howsepian described Plaintiff as tearful, overwhelmed emotionally, depressed, on edge. (AR 1524.)  Physically, Plaintiff was noted to be sweating and his hair was matted; he appeared somewhat dazed.  (AR 1524.)

In September 2011, at an appointment with Dr. Howsepian, Plaintiff was reported to be "doing better than [Dr. Howsepian had] yet seen him."  (AR 1485.)  Plaintiff described meeting a woman who was also in one of his recovery groups.  (AR 1485.)  Plaintiff was noted to be bright and smiling, he had lost weight, had more color in his skin, more mobile facial expressions, and better eye contact.  (AR 1485.)  His treatment plan included continued supportive psychotherapy and to continue the currently prescribed medication.  (AR 1485.)

In December 2011, Plaintiff report to Dr. Howsepian that he had spent Thanksgiving with a friend and was trying to integrate into the family.  (AR 1462.)  Dr. Howsepian noted Plaintiff was tearful, thinner, depressed, but maintained fair eye contact and appeared neat and clean. (AR 1464.)

In June 2012, Plaintiff reported socializing with his neighbors (AR 1310) and in July 2012 he stated he tried to go out with friends when he had the money to do so (AR 1300-01).  In August 2012, an HUD-VAS social worker, Clara Pellizzari ("Pellizzari"), indicated Plaintiff had come to the office very upset about a rent increase.  (AR 1278-79.)  At the office, Plaintiff had become "extremely angry," and pounded his fist on a desk.  (AR 1279.)  "[Plaintiff] became very angry and picked up two coke containers which he and the other Veteran had left[,] squeezed them together forcing ice and coke to go all over the office.  He stormed to the door leading out of the office and kicked it so hard it flew open causing staff from the MST group to come out." (AR 1279.)  When he drove away from the HUD-VAS office, he cussed and "flipped [another social worker] off."  (AR 1279.)

Dr. Howsepian reviewed Pellizzari's note in the file, and Plaintiff called Dr. Howsepian to convey his "narrative side" of the story.  (AR 1277.)  Dr. Howsepian entered a note that Plaintiff "clearly fears being displaced from his residence due to profound financial constraints and becoming homeless, feels unfairly treated by having his rent increased almost 100% without any

commensurate increase in his income, fears his emotional and physical reactions to interpersonal contacts that he perceives as not helpful to him in his current plight, and possibly fears dying as a result of changes in his psychosocial situation."  (AR 1277.)

In August 2012, Dr. Howsepian drafted a letter in support of Plaintiff's social security disability claim.  Dr. Howsepian described the traumatic military events that underlie, in his opinion, Plaintiff's difficulty.  Dr. Howsepian stated that

> [Plaintiff] uses significant effort to avoid thoughts, feelings, conversations, and activities associated with this traumatic event, has a restricted range of affect, feels estranged from others, and reports a markedly diminished interest in or participation in significant activities.  His hyperarousal symptoms include problems falling and staying asleep, irritability and outbursts of anger (at times resulting in physical confrontation), and difficulty concentrating.  These symptoms clearly impaired his functioning, including his marriage that ended in divorce, and his ability to hold a job.  His condition is chronic and results in his being wholly, completely, and permanently disabled from gainful employment.

(AR 1281-82.)

On September 11, 2012, Dr. Howsepian talked with Pellizzari about Plaintiff's conduct at the HUD-VAS office in August.  Pellizzari indicated she had been working with Plaintiff for approximately 2 years, and told Dr. Howsepian multiple times that she "fears [Plaintiff] will be aggressive again, and that he appears to have gotten worse since being diagnosed with PTSD, waiving an envelope at her, announcing his diagnosis in a manner that appears to sanction his hostile response toward her."  (AR 1274.)

On October 29, 2012, Dr. Howsepian noted that Plaintiff "is significantly improved." (AR 1261.)   The rent increase in the HUD-VAS program had been "partially reversed," and Plaintiff was finally paid money he was owed in 2010 for his shoulder.  (AR 1261.)  Plaintiff had purchased a bicycle and had fixed his truck.  (AR 1261.)  Plaintiff planned to go to San Diego to visit the zoo with his neighbor who Plaintiff considered his "adopted son."  (AR 1261.)  Plaintiff was "[b]righter, lighter emotionally," and he appeared "more hopeful" and "more optimistic." (AR 1261.)

On November 7, 2012, a HUD-VAS social worker noted he had visited Plaintiff's apartment and Plaintiff had apologized for his behavior in Pellizzari's office in August 2012.

(AR 1261.)  He informed the social worker things were going well for him, and he was still working on his social security appeal so he would have more money.  (AR 1261.)  Plaintiff stated that he was not able to work because of a variety of physical and mental disorders, but was overall content with life.  Plaintiff said he helps his neighbors whenever possible, and they have been helping him.  (AR 1261.)

On November 27, 2012, a HUD-VAS social worker received a call from Plaintiff asking the social worker to speak with Plaintiff and his apartment manager about whether or not Plaintiff owed rent.  (AR 1250.)  The social worker and Plaintiff met with the apartment manager who explained that Plaintiff had a credit towards his rent, and he reassured Plaintiff that he had no plans to evict Plaintiff from his apartment.  (AR 1250.)  The social worker noted that "[d]uring all of the conversation, the veteran stayed calm and interacted appropriately with the apartment manager."  Plaintiff gave credit to the group he is attending on Fridays and to the work he is doing with his psychiatrist, Dr. Howsepian.  (AR 1250.)

## B.      Administrative Proceeding Background

Plaintiff's application was denied initially and on reconsideration.  Plaintiff requested a hearing before an administrative law judge ("ALJ") which was held on November 17, 2009.  (AR 27-65.)  On January 10, 2010, the ALJ issued a decision finding Plaintiff not disabled.  (AR 15-22.)  Plaintiff sought review of that decision before the Appeals Council, which was denied, and Plaintiff sought judicial review.   The district court remanded for further administrative proceedings (AR 1039-70); an additional hearing was held before a new ALJ on February 12, 2013.  (AR 973-1004.)  On March 15, 2013, the ALJ issued a partially favorable decision, finding Plaintiff was disabled from August 31, 2007, through June 15, 2009, but medical improvement occurred and Plaintiff was not disabled on or after June 16, 2009.  (AR 932-47.)

### 1.      Testimony of the Vocational Expert

A Vocational Expert ("VE") appeared at the hearing on February 12, 2013, and testified. (AR 998-1001.)  The ALJ posed several hypotheticals for the VE to consider.  First, the ALJ asked the VE to consider a person who is the same age as Plaintiff and with the same education and work history who can lift and carry 20 pounds occasionally and 10 pounds frequently; sit,

stand, or walk six to eight hours per workday; only occasionally perform overhead reaching with the upper left extremity; limited to simple routine tasks; and can have only occasional public contact.  (AR 998.)  The VE testified that such a person could not perform Plaintiff's past work, but could perform other work such as silverware wrapper, garment sorter, and bottle line attendance.  (AR 998.)

The ALJ posed a second hypothetical that involved an individual with the same limitations as set forth in the first hypothetical, but with added limitations:  only occasional forceful gripping and/or grasping with the left upper extremity, which is the non-dominant hand; and no static or repetitive neck movements.  (AR 999.)  The VE testified there would be no change from the first hypothetical in the work that could be performed.  (AR 1000.)

The ALJ posed a third hypothetical which included all the limitations from the second hypothetical and added an additional limitation:  the left hand can be used only for 10 to 15 minutes at a time without the need for rest, so essentially the person would be working one-handed.  (AR 1000.)  The VE testified there would be no work that a person with this added limitation could perform.

Plaintiff's counsel asked the VE to consider the first hypothetical with the added limitation that the person would not be able to reach with both hands forward more than one-third of the day.  (AR 1000.)  The VE testified there would be no jobs available for a person with those limitations.  (AR 1000.)  Plaintiff's counsel also asked the VE whether the garment sorter and the bottle line work identified by the VE require a worker to move his head more than 45 degrees fairly repetitively throughout the day.  (AR 1001.)  Assuming a person could not move his head more than 45 degrees fairly repetitively throughout the day, the VE testified that someone precluded from that type of motion more than occasionally would not be able to perform any work.  (AR 1001.)

## 2.    ALJ Decision

On March 15, 2013, the ALJ issued a decision, finding Plaintiff was disabled from August 31, 2007, through June 15, 2009.  (AR 941.)  The ALJ also found that medical improvements occurred as of June 16, 2009, and determined that Plaintiff's disability ended on that date.

(AR 942.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since August 31, 2007 (AR 936); (2) from August 31, 2007, through June 15, 2009, the period of disability, Plaintiff had severe impairments including left shoulder supraspinatus tendinosis, cervical degenerative disc disease, obesity, history of carpal tunnel syndrome, history of left arm injury, dysthymic disorder, pain disorder, personality disorder, cannabis dependence, alcohol dependence in remission, and possible PTSD (AR 936); (3) from August 31, 2007, through June 15, 2009, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1  (AR 936); and (4) between August 31, 2007, and June 15, 2009, Plaintiff had the residual functional capacity  ("RFC")  to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk six to eight hours per eight-hour day; occasionally reach overhead with the left arm; occasionally forcefully grip and grasp with the left hand; cannot do static neck movements; can perform simple and routine tasks; and can have no contact with supervisors, coworkers, or the public.  (AR 936).  The ALJ concluded that between August 31, 2007, and June 15, 2009, there were no jobs that existed in significant numbers in the national economy that Plaintiff could perform.  (AR 941.)

The ALJ found that medical improvement occurred as of June 16, 2009, that increased Plaintiff's RFC, and Plaintiff's disability ended.  (AR 942-43.)  Plaintiff's RFC beginning on June 16, 2009, included the capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk six to eight hours per eight hour day; occasionally reach overhead with the left arm; occasional forceful gripping and grasping with the left hand; not doing static neck movements; and performing simple routine tasks with occasional public contact.  (AR 943.)  The ALJ found that beginning on June 16, 2009, there have been jobs that exist in substantial numbers in the national economy that Plaintiff can perform.  (AR 946.)

**3.      Review before the Appeals Council**

Plaintiff filed exceptions to the ALJ's decision with the Appeals Council on April 15, 2013.  (AR 5-8.)  The Appeals Council determined the ALJ fully considered and evaluated the evidence and reached an appropriate conclusion on the issues.  (AR 920-24.)  Therefore, the Appeals

1  Council found no basis to assume jurisdiction of the ALJ's decision, and the ALJ's decision

2  became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

3  **C.      Plaintiff's Argument on Appeal**

4        On January 9, 2014, Plaintiff filed a complaint before this Court seeking review of the

5  ALJ's decisions.   In his opening brief, Plaintiff argues the ALJ made no clear showing of

6  cessation of disability, gave inadequate reasons for rejecting the opinion of Dr. Howsepian, and

7  argues that the credibility determination is not relevant to a medical improvement finding.  (Doc.

8  14.)

9                                    **SCOPE OF REVIEW**

10       The ALJ's decision denying benefits "will be disturbed only if that decision is not

11  supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

12  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

13  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

14  Instead, the Court must determine whether the Commissioner applied the proper legal standards

15  and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

16  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).   "Substantial evidence is more than a mere

17  scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec*., 528 F.3d 1194, 1198 (9th

18  Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might

19  accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

20  (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must

21  consider the entire record as a whole, weighing both the evidence that supports and the evidence

22  that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

23  specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

24  2007) (citation and internal quotation marks omitted).

25                                    **APPLICABLE LAW**

26       An individual is considered disabled for purposes of disability benefits if he or she is

27  unable to engage in any substantial, gainful activity by reason of any medically determinable

28  physical or mental impairment that can be expected to result in death or that has lasted, or can be

expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.   *Id.* §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"),   20 C.F.R. 404, Subpart P, App. 1.   *Id.* §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.   *Id.* §§ 404.1520(f), 416.920(f).   If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.   *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.   *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

### A.    There is No Substantial Evidence Showing Medical Improvement

Plaintiff argues the ALJ improperly determined that he had medical improvement such that he became not disabled as of June 16, 2009, which the Commissioner disputes.

1    The ALJ gave little weight to Dr. Swanson's January 2008 opinion (AR 393) and Dr.

2 Garcia's March 2008 opinion (AR 503) that Plaintiff's impairments were non-severe, and the ALJ

3 found Plaintiff to be unable to adequately relate with supervisors, co-workers, and the public at the

4 time of these opinions.   The ALJ credited Dr. Howsepian's opinion regarding Plaintiff's

5 functioning prior to June 2009, but found his opinions after June 2009 not to be consistent with the

6 medical record which the ALJ determined showed "significant improvement."   (AR 939-40.)

7 Specifically, the ALJ determined that as of June 16, 2009, Plaintiff could interact with co-workers,

8 supervisors, and could have limited contact with the general public.   According to the VE

9 testimony, a person with this limitation – in addition to Plaintiff's other limitations which remained

10 the same after June 2009 – would be able to perform alternative work in the national economy.   As

11 such, the ALJ concluded Plaintiff was unable to perform any work from August 31, 2007, through

12 June 15, 2009, but on June 16, 2009, medical improvement occurred such that Plaintiff's disability

13 ended.

14          **1.      Legal Standard – Medical Improvement**

15    Once a claimant is found to be disabled, cessation of disability may only be assessed

16 following an eight-step sequential evaluation process.   20 C.F.R. § 404.1594(f).   The eight-step

17 analysis is as follows:   (1) if a claimant is currently engaged in substantial gainful activity,

18 disability has ended; (2) if not, and the claimant meets a Listing, then disability continues; (3) if

19 the claimant does not meet or equal a listing, the ALJ will determine whether medical

20 improvement has occurred (an increase in the claimant's RFC assessment); (5) if no medical

21 improvement – or no improvement related to the ability to work has occurred – disability

22 continues, unless certain exceptions apply (20 C.F.R. §§ 404.1594(d)-(e), (f)(5)); (6) if there has

23 been medical improvement related to the claimant's ability to work, the ALJ will determine

24 whether *all* the current impairments, in combination, are "severe," and if not, disability ends; (7) if

25 the claimant meets the "severity" criteria, the ALJ will determine the current RFC and if the

26 claimant is able to do past relevant work, disability ends; (8) if the claimant remains unable to do

27 past work, the ALJ will determine whether the claimant can perform other work, given his RFC,

28 age, education, and past work experience – if so, disability ends, if not then disability continues.

1

2       Medical improvement is defined under the regulations as

3           any decrease in the medical severity of [a claimant's] impairment(s) which was
4           present at the time of the most recent favorable medical decision that you were
            disabled or continued to be disabled.   A determination that there has been a
5           decrease in medical severity must be based on changes (improvement) in the
            symptoms, signs and/or laboratory findings associated with your impairment(s)
6           (see § 404.1528).

7    20 C.F.R. § 404.1594(b)(1).  Medical improvement is a term of art which refers to the "medical

8    severity" of the impairments previously found disabling based solely on medical evidence

9    consisting of "symptoms, signs and/or laboratory findings associated with those impairments."

10   *Anderson v. Astrue*, 2008 WL 4500882, (C.D. Cal. Oct. 6, 2008) (quoting 20 C.F.R. §§

11   404.1594(b)(1), 416.994(b)(1)(I)); *see also Threet v. Barnhart*, 353 F.3d 1185, 1190 n.7 (10th Cir.

12   2003) (error for ALJ to base finding of medical improvement on rejection of claimant's statement

13   of daily activities and a lack of medical attention).

14       **2.      Analysis**

15       Plaintiff contends in finding him disabled prior to June 15, 2009, the ALJ concluded

16   Plaintiff had significant social limitations and he was unable to relate to supervisors, co-workers,

17   and the public.  It was this limitation that precluded Plaintiff from being able to perform any work.

18   The ALJ found medical improvement in June 2009 and concluded that after June 15, 2009,

19   Plaintiff's social limitation could be reduced to only occasional public contact with no restriction

20   on contact with co-workers or supervisors.  (AR 943.)  Plaintiff argues the ALJ's determination of

21   improvement in this regard was based on a single treatment note of Dr. Howsepian's dated June

22   15, 2009, in which Dr. Howsepian noted Plaintiff was in a "brighter mood."  (AR 618, 943.)

23   Plaintiff contends this isolated treatment note does not support a finding that Plaintiff's mental

24   impairment had medically improved.  Any improvement that may have been noted was temporary;

25   as a whole, the record reflects Plaintiff's symptoms fluctuated with short periods of some

26   improvement.  Further, the ALJ did not discuss the evidence contradicting the finding there was

27   medical improvement.   For the same reason, Plaintiff argues the ALJ's rejection of Dr.

28

22

1  Howsepian's opinions after June 2009 as inconsistent with his own treatment notes is similarly

2  flawed.

3      The Commissioner emphasizes that the ALJ considered Dr. Howsepian's treating notes and

4  the VA progress notes at length and argues the ALJ did not merely isolate a few areas of

5  improvement.   The Commissioner maintains the ALJ was entitled to interpret Dr. Howsepian's

6  treating notes and other evidence as showing medical improvement of Plaintiff's mental condition

7  after June 2009.   Factually, the Commissioner emphasizes that Dr. Howsepian reported Plaintiff

8  was doing better on multiple occasions after June 2009, Plaintiff's social workers consistently

9  indicated Plaintiff was stable and able to live independently, and Plaintiff was making friends and

10  had interacted appropriately during a dispute with Plaintiff's apartment manager.   The ALJ

11  discussed Plaintiff's outbursts of anger after June 2009 and indicated they were instances where

12  Plaintiff was manipulative and aggressive until his needs were met, thus his anger was goal

13  directed regarding specific situations.   The Commissioner argues the ALJ's finding of medical

14  improvement was based on substantial evidence, as was the ALJ's rejection of Dr. Howsepian's

15  opinions after June 2009, and the ALJ properly weighed the evidence that was contrary to a

16  finding of medical improvement.

17      When considering symptoms of mental disorders, "[r]eports of 'improvement' in the

18  context of mental health issues must be interpreted with an understanding of the patient's overall

19  well-being and nature of [his] symptoms." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir.

20  2014).   Mental health treatment notes must be "interpreted with an awareness that improved

21  functioning while being treated and while limiting environmental stressors does not always mean

22  the claimant can function effectively in the workplace." *Id.*   Further, exercising caution in

23  inferring from treatment notes that a claimant is able to work is "especially appropriate when no

24  doctor or other medical expert has opined, on the basis of a full review of all relevant records, that

25  a mental health patient is capable of working or is prepared to return to work." *Id.*

26      In this case, Dr. Howsepian has been Plaintiff's treating psychiatrist since 2003, and has

27  followed Plaintiff's mental condition on a monthly basis.   He is regularly in contact with Plaintiff's

28  VA social workers, and all of Plaintiff's VA interactions are logged in VA progress notes which

are available for Dr. Howsepian's review.   In October 2009, Dr. Howsepian specifically opined Plaintiff had extreme limitation in the ability to interact with co-workers, supervisors, and the general public.  (AR 815.)  Since 2008, no other medical professional opined Plaintiff was not extremely limited in this regard.   Plaintiff underwent a social security disability compensation examination in January 2008 with Dr. Swanson who opined Plaintiff would be able to "relate appropriately to others in a job setting" (AR 393), but this opinion was rejected by the ALJ for the period prior to 2009 as it was not consistent with the examination findings.  (AR 939.)   Dr. Garcia affirmed Dr. Swanson's opinion in March 2008, but this opinion was also given little weight by the ALJ.   Neither of these opinions would have any relevance to Plaintiff's functioning in 2009 through 2012 – as the opinions were only predicated on the evidence in the record as of the dates of the opinions.

The only medical evidence of Plaintiff's mental health other than Dr. Howsepian's opinions and the VA treating notes from 2009 through 2012 is an examination by Dr. Glenn for purposes of Plaintiff's claim for VA benefits.  Dr. Glenn opined Plaintiff had moderate symptoms and assigned a GAF score of 55, but did not address Plaintiff's ability to interact with co-workers, supervisors, the general public, or Plaintiff's ability to perform at a job.  (AR 594-95.)  Dr. Glenn found Plaintiff's social and occupational impairment to be at a level of "reduced reliability and productivity due to the major depression," but he did not consider Plaintiff's ability to function with others in a workplace setting.  Although Dr. Glenn noted "moderate" limitations – as opposed to extreme limitations – his opinion does not directly contradict Dr. Howsepian's October 2009 opinion that while Plaintiff retained the ability to perform simple tasks, he had extreme limitation in the ability to relate to others in a workplace setting.  (AR 815.)  Because Dr. Glenn's opinion did not address Plaintiff's functionality in relationship to others in a work setting, the ALJ's assessment that Plaintiff was medically improved in 2009 such that he could interact appropriately with co-workers and supervisors appears predicated only on the ALJ's own assessment of Dr. Howsepian's treatment notes and the VA progress notes.  While the ALJ is entitled to weigh contradictory medical opinions and resolve any ambiguities in the evidence, the ALJ is not permitted to interpret the treating physician's records and substitute her own opinion for that of the

treating physician. *Jenkins v. Astrue*, 628 F. Supp. 2d 1140, 1149 (C.D. Cal. 2009) ("It is axiomatic that as a treating physician and a specialist in orthopedics, Dr. Frey's interpretation of her objective and clinical findings trumps a contrary interpretation based on nothing more than the ALJ's conflicting view of their significance." (citing *Gonzalez Perez v. Sec'y of Health & Human Servs.*, 812 F.2d 747 (1st Cir. 1987))).   Although Dr. Howsepian had noted Plaintiff was doing better on occasions in 2009 through 2012 (AR 618 (noting flashes of a brighter mood); AR 648 (significantly improved but remained angry, frustrated, and depressed); 1261 (October 2012 noting Plaintiff was brighter and lighter emotionally); 1474 (November 2009 noting Plaintiff was dramatically improved from September 2009); 1485 (September 2011 Dr. Howsepian notes Plaintiff is doing better than he had yet seen him); and 1733 (noting in February 2010 Plaintiff remained depressed, but was smiling more than Dr. Howsepian had seen), he explained very articulately why Plaintiff remained unable to interact with others in a workplace setting in his October 2009 report.   Dr. Howsepian reasoned that due to Plaintiff's intense anger, irritability, cognitive distortions, and emotional instability, he reacted to perceived injustices and slights in a manner that is incompatible with gainful employment and with social situations generally. (AR 813-15.)   The record strongly supports Dr. Howsepian's opinion of Plaintiff's functioning in this regard.   Despite that Plaintiff was noted to have improved at various appointments, he also appeared in crisis in May 2011 (AR 1524), he continued to have angry conflicts with his social workers (AR 834, 1278-79), and angry interactions with his apartment managers (AR 833-35, 1607).    These events corroborates Dr. Howsepian's October 2009 opinion that when Plaintiff is "substantially stressed and confronted by those in authority, he is prone to become violent."  (AR 813.)

Although the ALJ interpreted Plaintiff's anger during various incidents from 2009 through 2012 to be goal directed toward specific situations – and thus a method for obtaining what he wanted rather than a feature of his mental condition – Plaintiff's episodic anger appears quite consistent with Dr. Howsepian's October 2009 opinion regarding Plaintiff's irritability when challenged by anyone in authority, such as his social workers, addiction counselors, or apartment managers with whom Plaintiff had intense conflict at times in 2009 through 2012.  The fact that

1  Plaintiff was able to navigate a disagreement with his apartment manager one time with the

2  assistance of his social worker, was able to live alone, and seemed to be making friends with other

3  veterans in his VA complex does not contradict Dr. Howsepian's view of Plaintiff's mental

4  limitations.  *See Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("Dr. Oh's statements

5  must be read in context of the overall diagnostic picture he draws.  That a person who suffers from

6  severe panic attacks, anxiety, and depression makes some improvement does not mean that the

7  person's impairments no longer seriously affect her ability to function in a workplace.").

8       Moreover, the improvement noted by Dr. Howsepian in his treating notes was exclusively

9  made in a clinical setting where Plaintiff experienced limited stressors, which is distinct from how

10  a claimant could be expected to perform or function in a workplace.  *Garrison*, 759 F.3d at 1017

11  (notations of improvement "must also be interpreted with an awareness that improved functioning

12  while being treated and while limiting environmental stressors does not always mean that a

13  claimant can function effectively in a workplace").  Without a medical opinion regarding the

14  improvement the ALJ inferred from Dr. Howsepian's treating notes and VA progress notes, the

15  ALJ's interpretation of medical improvement is merely a substitute for Dr. Howsepian's October

16  2008 and August 2012 opinions that Plaintiff had extreme limitations in his ability to relate to

17  others in a workplace setting and that he was wholly unable to work.  Notations of improvement in

18  mood or appearance do not contradict or undermine Dr. Howsepian's explanation as to Plaintiff's

19  functionality with others in a work setting or those in authority over him.

20       Absent a medical opinion in 2009 other than Dr. Howsepian's regarding Plaintiff's ability

21  to work and/or relate to others in a workplace setting, there was no medical evidence from which

22  the ALJ could infer Plaintiff's condition improved in 2009 other than her own interpretation of Dr.

23  Howsepian's treating notes and the VA progress notes.  The ALJ's lay interpretation of the Dr.

24  Howsepian's treatment notes is an insufficient basis to find Plaintiff medically improved in 2009

25  or to discredit Dr. Howsepian's opinions in October 2009 and August 2012.

26  **B.**       **Remand for the Reinstatement of Benefits**

27       Because the Court cannot conclude there is substantial evidence supporting the ALJ's

28  finding of medical improvement in 2009, Plaintiff's benefits should not have been terminated as of

1    June 16, 2009.   The Ninth Circuit has held that "[b]enefits wrongfully terminated should be

2    reinstated without further agency proceedings."   *Iida v. Heckler*, 705 F.2d 363, 365 (9th Cir.

3    1983.)   As Congress has mandated that the Commissioner review a claimant's disability status

4    every three years, *see* 42 U.S.C. § 421(i), no purpose is served by remanding the matter to the

5    agency for further development of the record.   Accordingly, the matter must be remanded only for

6    the reinstatement of benefits.

7                                              **CONCLUSION**

8           Based on the foregoing, the Court finds that the ALJ's decision is not supported by

9    substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for the

10   reinstatement of benefits. The Clerk of this Court is DIRECTED to enter judgment in favor of

11   Plaintiff Donald Schneider and against Defendant Carolyn W. Colvin, Acting Commissioner of

12   Social Security.

13

14

     IT IS SO ORDERED.

15

16     Dated:   __March 23, 2015__                        _____ **/s/ Sheila K. Oberto**
                                                           UNITED STATES MAGISTRATE JUDGE
17

18

19

20

21

22

23

24

25

26

27

28

                                                    27